J-S33025-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: O.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.M.M., BIOLOGICAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1595 MDA 2018 |

Appeal from the Order Entered August 20, 2018
In the Court of Common Pleas of Berks County
Orphans' Court at No(s): 85651

| | | |
|---|---|---|
| IN THE INTEREST OF: H.L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.M.M., BIOLOGICAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1596 MDA 2018 |

Appeal from the Order Entered August 20, 2018
In the Court of Common Pleas of Berks County
Orphans' Court at No(s): 85652

BEFORE:  LAZARUS, J., OTT, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OTT, J.:                **FILED: SEPTEMBER 16, 2019**

P.M.M. ("Mother") appeals from the August 20, 2018 orders in the Court of Common Pleas of Berks County that involuntarily terminated her parental rights to her daughters, O.M.M., born in October of 2014, and H.L.M., born in November of 2015 (collectively, "the Children").  After careful review, we affirm.

We summarize the relevant facts and procedural history, as follows. Soon after the birth of O.M.M. in October of 2014, Berks County Children and Youth Services ("BCCYS") received a report that Mother had stopped attending therapy for her mental health condition, and that E.C.M. ("Father") had obtained a temporary Protection from Abuse ("PFA") order against Mother. Trial Court Opinion, 10/24/18, at 5. Thereafter, from October of 2014, through August of 2015, Mother and Father received parenting assistance in their home. *Id.* During that time, Mother's mental health remained a concern, as did the parents' ability to maintain stable housing. *Id.* In addition, BCCYS received reports that O.M.M. was not wearing a medically prescribed hand brace in the home, *inter alia*. *Id.*

On January 22, 2016, following a hearing on dependency petitions filed by BCCYS, the juvenile court adjudicated the Children dependent. *Id.* However, Mother and Father maintained physical custody of the Children. They were required to comply with the following permanency plan objectives: participate in parenting education, mental health and domestic violence evaluations and comply with any recommendations, establish and maintain stable and appropriate housing and income, and notify BCCYS of any changes in income or residence. *Id.* at 5-6.

On May 24, 2016, the juvenile court placed the Children in the emergency custody of BCCYS due to an incident that occurred the same day,

which two caseworkers observed during a visit. The testimonial evidence supports the trial court's description of the incident, as follows.

> Mother indicated that H.L.M. [then six months old] was choking[,] and that they had called an ambulance. Caseworkers noted that the child was lethargic and that her eyes were "rolling back in her head." Further, the home was cluttered and filthy. It was also noted that Mother and Father had failed to follow medical instructions [to] elevat[e] [H.L.M.]'s crib.[1]

*Id.* at 6. The record reveals that Mother was granted supervised physical custody with the Children, which never became unsupervised.

Permanency review hearings occurred on October 25, 2016, January 18, 2017, April 4, 2017, and September 19, 2017. Following each hearing, the juvenile court found that Mother was moderately compliant with the permanency plan, but that she had made no progress in meeting the permanency plan objectives. *Id.* at 6-7.

On August 16, 2017, BCCYS filed petitions for the involuntary termination of Mother's and Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The orphans' court held hearings on the petitions on March 12, 2018, April 9, 2018, May 21, 2018, and June 21, 2018.

---

[1] Annette Allwein was a parenting instructor from Partners in Parenting who provided services to this family from September of 2015, prior to the Children's placement in the physical custody of BCCYS, until August of 2017. She was present during the incident that resulted in the Children's placement on May 24, 2016. Ms. Allwein testified, "There was supposed to be a pillow under the mattress to elevate [H.L.M.] because she had choked previously. So it was told to the parents to elevate her slightly in the crib. There was no pillow there. . . ." N.T., 4/9/18, at 11.

During the hearings, Melissa Krishock, Esquire, served as the guardian *ad litem* ("GAL") for the Children, who were then two and three years old.[2]

With respect to the petition for the involuntary termination of Mother's parental rights, BCCYS presented the testimony of Heather Barger, its adoption caseworker, and Ashlea Mellinger, its placement caseworker; Annette Allwein, parenting instructor at Partners in Parenting, who also supervised visits between Mother and the Children; James Small, Ph.D., *via* telephone, who performed a mental health evaluation of Mother; Krista Kantner, the Court Appointed Special Advocate ("CASA") provider; and Nicola Stidham, a psychotherapist at the Commonwealth Clinical Group, who worked with Mother on her domestic violence and mental health issues. Mother testified on her own behalf. In addition, she presented the testimony of J.S., her former brother-in-law with whom she resided at the time of the hearing, and R.V.B., the Children's maternal grandfather.

_____

[2] In ***In re Adoption of L.B.M.***, 161 A.3d 172 (Pa. 2017), our Supreme Court held that 23 Pa.C.S. § 2313(a) requires that a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, which the Court defined as a child's preferred outcome. In this case, due to their young ages, the Children were unable to express their preferred outcome regarding the termination of Mother's parental rights. Therefore, the appointment of Attorney Krishock as GAL satisfied the Children's right to legal counsel. ***See In re T.S.***, 192 A.3d 1080 (Pa. 2018) (holding, in the case of children who were two and three years old, that an attorney-GAL representing the best interests of the children satisfied their right to legal counsel pursuant to Section 2313(a)).

The testimonial evidence revealed that the Children have special needs. Specifically, the older child, O.M.M., is diagnosed with "hemiparesis of the right side," which is related to a stroke she had while in utero. N.T., 3/21/18, at 21. O.M.M. receives occupational, physical, and speech therapy, and she wears hand and foot braces. In addition, O.M.M. suffers from severe eczema. *Id.* The younger child, H.L.M., receives speech therapy. *Id.* Despite these difficulties, the Children are doing well and having their needs met in kinship care, where they reside together. *Id.* at 32.

By order dated August 20, 2018, the orphans' court involuntarily terminated Mother's parental rights to the Children.[3] On September 19, 2018, Mother timely filed a notice of appeal. On September 26, 2018, Mother filed concise statements of errors complained of on appeal.[4] The trial court filed its Rule 1925(a) opinion on October 24, 2018.

---

[3] On the same date, the orphans' court issued an order denying BCCYS's petition for the involuntary termination of Father's parental rights. BCCYS filed notices of appeal, which it subsequently discontinued on the basis that Father voluntarily relinquished his parental rights to the Children on March 29, 2019. *See In the Interest of O.M.M. and H.L.M.*, 1413 & 1414 MDA 2018. With respect to the instant appeals from the orders involuntarily terminating Mother's parental rights, Father has not participated.

[4] Mother did not concurrently file the concise statements of errors complained of on appeal with the notices of appeal in contravention of Pa.R.A.P. 1925(a)(2)(i) and (b). BCCYS asserts no prejudice arising from Mother's procedural violation, nor are we aware of any. Therefore, we will not quash or dismiss her appeals. *See In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009); *Cf. J.P. v. S.P.*, 991 A.2d 904, 908 (Pa. Super. 2010) (holding that appellant waived all issues by failing to file a concise statement of errors complained of on appeal when directed by the trial court).

On December 10, 2018, Mother's counsel filed petitions for extension of time to show cause, wherein he alleged he was appointed by the orphans' court as Mother's appellate counsel on November 20, 2018, and he became aware of the rules to show cause on December 7, 2018. This Court denied counsel's request and discharged the rules on December 12, 2018.

Mother raises the following issues for our review:

> A. Did the [orphans'] court err in determining that Exhibit 74, a summary prepared by the BCCYS caseworker, was admissible evidence as a matter of law to support its decision to terminate [Mother's] parental rights?
>
> B. Did the [orphans'] court err in determining that [BCCYS] proved by clear and convincing evidence that termination best served the needs and welfare of the Children as required by 23 Pa.C.S.A. [§] 2511(b) due to the lack of testimony presented by [BCCYS] regarding the emotional bond between Mother and [the] Children?
>
> C. Did the [orphans'] court err in failing to allow Mother to present testimony regarding her attempts to cooperate with services and credit her for her improvement in life coping skills to avoid the termination of her parental rights?
>
> D. Did the [orphans'] court err in failing to make findings on the record of specific [23 Pa.C.S. §]2511(a) grounds for termination, specific findings regarding [23 Pa.C.S. §]2511(b), and its reasons for "semi-orphaning" the . . . Children by terminating [Mother]'s rights, but not the rights of . . . Father?

Mother's brief at 1.

Our standard of review is as follows.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

- 6 -

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, we conclude that the certified record supports the orders pursuant to Section 2511(a)(2) and (b), which provide as follows.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary

- 7 -

for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).[5]

This Court has explained that the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be

---

[5] Based on this disposition, we need not consider 23 Pa.C.S. § 2511(a)(1), (5) and (8).

remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* Further, the grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

With respect to Section 2511(b), we have explained, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the

particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

In her first issue, Mother asserts that the court abused its discretion in admitting Exhibit 74, which was a summary of the Children's dependency matter prepared by Heather Barger, the BCCYS caseworker. It is well-established that decisions regarding the admissibility of evidence "are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.'" ***Phillips v. Lock***, 86 A.3d 906, 920 (Pa. Super. 2014) (quoting ***Stumpf v. Nye***, 950 A.2d 1032, 1035-1036 (Pa. Super. 2008)).

Mother fails to provide any argument in her brief relating to her first issue. Therefore, the issue is waived. ***See Chapman-Rolle v. Rolle***, 893 A.2d 770, 774 (Pa. Super. 2006) (stating, "'It is well settled that a failure to argue and to cite any authority supporting any argument constitutes a waiver of issues on appeal.'") (quoting ***Jones v. Jones***, 878 A.2d 86, 90 (Pa. Super. 2005)).

We next review Mother's third issue, wherein she asserts that the orphans' court abused its discretion by denying her request on the record in open court on the final day of the subject proceeding to present the testimony of Michelle Owens, Mother's peer counselor at Berks Counseling Center

("BCC"), and Brittney Rio, Mother's therapist at BCC. Mother's counsel proffered, in total, "I wish to present them to make a record regarding my client who has been presented in a less than positive light by other professionals." N.T., 6/21/18, at 12.

Thereafter, the following relevant colloquy occurred:

[GAL]: Your Honor, while not speaking for [counsel for BCCYS,] but I did say to him just right now as the [GAL] I would be willing to stipulate Ms. Rio[] is going to testify [that Mother] completed the program at BCC, that's what was already submitted as an exhibit by [BCCYS]. So I'm not really sure why we need to have additional testimony.

The peer counselor we would agree . . . is going to say she worked with [Mother,] and she saw [Mother] make changes per the . . . program that Ms. Rio had her in.

[Counsel for BCCYS]: . . . There's no necessity to create a record for witnesses that are going to confirm what the parties are agreeing to.

N.T., 6/21/18, at 12-13. The orphans' court agreed, and stated to Mother's counsel, "And your proffer doesn't tell me anything additional. . . ." *Id.* at 13. We discern no abuse of discretion by the court.

In addition, Mother has not demonstrated that the court's decision to exclude this testimony was prejudicial. Mother testified during the subject proceeding, "I'd like to give my custody to [Father], but keep my parental rights." N.T., 5/21/18, at 139. In fact, during the Children's dependency, Mother did not want to resume custody of either Child. Heather Barger, the BCCYS adoption caseworker, testified that Mother "made several statements [to] me over the months that she was not looking to be the return parent for

the [C]hildren[,] but that she very much wanted [Father] or at one point her Aunt [L.] to be the return resources for the girls. . . ." N.T., 3/12/18, at 39-40.

Nevertheless, Mother argues in her brief that the proposed testimony of the BCC employees was relevant to her desire to remain a part of the Children's lives, *albeit*, not to regain custody. **See** Mother's brief at 17. We remind Mother that the only issue before the orphans' court was whether or not BCCYS demonstrated by clear and convincing evidence that her conduct warranted the involuntary termination of her parental rights under Section 2511(a) and whether it would serve the Children's needs and welfare to terminate her parental rights under Section 2511(b). Therefore, we discern no prejudice against Mother by the court's prohibition of the BCC employees' testimony. Mother's third issue fails.

In her remaining two issues, Mother asserts that the court indeed abused its discretion in involuntarily terminating her parental rights pursuant to Section 2511(a) and (b). We disagree.

With respect to Section 2511(a)(2), the orphans' court found that Mother has failed to satisfy her permanency plan objectives, including addressing her mental health, and maintaining appropriate housing and employment. The testimonial evidence supports these findings as well.

Mother testified that, when she was eight years old, she was diagnosed with mental health illnesses, including, but not limited to, bipolar disorder and

schizophrenia. N.T., 5/21/18, at 123. James Small, Ph.D., performed a mental health evaluation of Mother in March of 2016. N.T., 4/9/18, at 73. Dr. Small diagnosed her with unspecified bipolar disorder, unspecified anxiety disorder, unspecified neurocognitive disorder, which he stated, "may be a learning disorder or maybe . . . brain damage from an injury." *Id.* at 74-75. In addition, Dr. Small diagnosed Mother with attention deficit hyperactivity disorder and personality disorder with borderline features. *Id.* at 75. Dr. Small concluded that, "[O]verall [Mother] showed little responsibility, little judgment, and little commitment to the [C]hildren. For these reasons[,] I would really question whether she could provide adequate [care] for any children but particularly special needs children." *Id.* at 78.

Nicola Stidham, a psychotherapist from Commonwealth Clinical Group, treated Mother from June 30, 2016, through August 1, 2017, for domestic violence and mental health. N.T., 4/9/18, at 110-111, 115. She testified that Mother consistently attended psychotherapy sessions until the spring of 2017, but her progress in her treatment goals "was generally very limited." *Id.* at 114. Ms. Stidham described Mother's domestic violence behavior as follows:

> There were concerns in regard to her ability to manage her aggression and her emotion regulation. There was a domestic violence incident happening with her roommate she had been living with in April of 2017. It was an incident that escalated from a verbal altercation to one in which she threatened bodily harm on the roommate. I don't know if it actually went to the extent that physical harm occurred[,] but certainly I think that speaks to her at that particular moment [regarding] her inability to manage her anger and her impulses.

*Id.* at 114. Ms. Stidham testified that she worked with Mother on her "unstable mental health . . . in regard to her aggression and her lack of ability to maintain her impulses, which was a little bit separate than having . . . anger management problems." *Id.* at 115. She continued, "So that is to say that [Mother] from my perspective had very deep seeded very, very chronic and per[v]asive issues with the bonding attachment, intimate partner relationship, that was a lot deeper than just covering anger management in session." *Id.*

With respect to her intimate partner relationships, Ms. Stidham testified that, through the course of her treatment, Mother had "a series of intimate partner contacts. . . ." *Id.* at 116. She explained:

> Some of these individuals she had ended up rooming with because her housing wasn't stable. Some of these individuals were sexually abusive toward her. And at best displayed grossly inappropriate sexual boundaries with her. Th[is] w[as] also something that was addressed in session in regard to her ability to remain independent and not [en]meshed with unstable, unhealthy, toxic male partners.

*Id.* Ms. Stidham testified that Mother "failed to see how her choices in paramours would relate to her ability to maintain her mental health . . . as well as her global level of functioning." *Id.*

Ms. Stidham unsuccessfully discharged Mother in August of 2017, "after several weeks, if not months, of . . . inconsistent treatment attendance." *Id.* at 117. In fact, Ms. Stidham testified that, on August 1, 2017, Mother "verbally told me she did not want to continue with services. . . ." *Id.* Ms. Stidham concluded in her written discharge summary that Mother did not

demonstrate the ability to be a long-term resource for the Children. *Id.* She explained:

> [W]henever I look at an individual who is on track to being a long-term resource for children[,] I look at their abilities to be in a protective caretaking role. Some of those areas would be stable housing, stable mental health, a consistent admission to taking responsibility for any allegations that necessitated CYS involvement and placement of children, and the ability to demonstrate long-term, and a self-sufficiency and ability to not be [en]meshed with toxic abusive partners or individuals that are not very healthy for that particular person. A person who is readying for stable long-term employment and/or schooling, a person that is nurturing toward their children and having positive visits and interactions and bonding with their children. As well as a demonstrated ability over time in therapy to be able to show motivation for improvement in these areas. . . . And it was my understanding and my observation that [Mother] did not meet any of that criteria or make any improvement [in] any of those aforementioned areas.

*Id.* at 117-118.

With respect to housing, Ms. Barger, the current BCCYS caseworker for the family, testified that Mother has not maintained stable housing. N.T., 3/12/18, at 25. She testified that Mother has lived in nine locations while the Children have been dependent. *Id.* Ms. Barger testified that, at the time of the subject proceeding, Mother was residing with J.S., her former brother-in-law, in Montgomery County, Pennsylvania. *Id.* She explained that the home

of J.S. was not appropriate for the Children because the Montgomery County child welfare agency was involved with him regarding his own children.[6] *Id.*

With respect to employment, Mother testified that, in August of 2017, she obtained a Commercial Driver's License. N.T., 5/21/18, at 133. She testified that she was employed with a truck company for four months. *Id.* Ms. Barger testified that Mother "was let go . . . for not returning to work." N.T., 3/12/18, at 39. There is no record evidence that Mother was employed at the time of the subject proceeding.

Finally, regarding Mother's visits with the Children, Ms. Allwein, the parenting instructor, supervised them. She testified that Mother "missed quite a few" of the visits because she moved to Pottstown and went on the road as a truck driver. N.T., 4/9/18, at 15. She testified that, during the visits, most of Mother's attention went to O.M.M., and that Mother was less patient with H.L.M. *Id.* at 15-16. Further, Ms. Allwein testified as follows on direct examination:

Q. [H]as [Mother] ever made any strange or bizarre comments during visits with the girls?

A. Yeah. . .

Q. Can you give an example, please?

A. [T]he one was never face your enemy, always keep your back to them. I don't know . . . what that was about or anything.

---

[6] J.S. testified that he has four sons, ages eight, five, three, and eighteen months. N.T., 5/21/18, at 115-116. He testified that his sons reside with him in Pottstown, Montgomery County, along with Mother. *Id.* at 115.

*Id.* at 31.

Further, Ms. Allwein testified that she worked with Mother on parenting goals both before and after the Children were placed in the custody of BCCYS. Those goals included budgeting, housekeeping, meeting the medical needs of the Children, employment, and stable housing. *Id.* at 9. She testified that Mother was consistent in meeting with her until September of 2016. *Id.* at 13. Ms. Allwein testified that Mother made no progress in meeting any of her parenting goals. *Id.* at 10, 12-13.

Based on the above testimonial evidence, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(a)(2). The evidence demonstrates that Mother's repeated and continued incapacity or refusal to make progress in her permanency plan objectives caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being. Further, the evidence demonstrates that the causes of Mother's incapacity or refusal cannot or will not be remedied.

With respect to Section 2511(b), Mother asserts that the evidence was insufficient to terminate under that section of the statute. The following case law is relevant.

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The

mere existence of an emotional bond does not preclude the termination of parental rights. ***See In re T.D.***, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." ***In re Adoption of T.B.B.***, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in ***In re A.S.***, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011).

Our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***In re T.S.M.***, ***supra*** at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***Id.*** at 269. The ***T.S.M.*** Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

Instantly, the orphans' court found:

Here, the caseworker, CASA appointee, and domestic violence counselor all testified that terminating Mother's parental rights are

in the best interests of the [C]hildren. BCCYS caseworker testified that there is no obvious bond between Mother and her children. She testified that there is a bond between [the kinship] mother and the children. (N.T., 3/12/2018, [at] 33). The placement caseworker testified that Mother has been involved in violent relationships since the pendency of the case. (N.T., 4/9/2018, [at] 133). The CASA appointee testified that Mother is disinterested and lacks affection when visiting with her children. (N.T., 4/9/2018, [at] 91-92). Mother's domestic violence counselor testified that Mother failed to meet any criteria or make any improvements in the required areas to be successfully discharged from treatment, including maintaining stable mental health, housing, and showing the ability to not be involved with toxic interpersonal relationships. (N.T., 4/9/2018, [at] 117-118). When looking at all the testimony, it is clear that Mother would be unable to provide the security, safety, and stability the [C]hildren need. Further, there is no obvious bond between Mother and her children.

Trial Court Opinion, 10/24/18, at 11-12.

The court's findings are supported by the testimony of the BCCYS caseworkers, Heather Barger and Ashlea Mellinger, in addition to the psychotherapist, Nicola Stidham, the parenting instructor, Annette Allwein, and the CASA provider, Krista Kantner. Indeed, there is no testimonial evidence that a parent-child bond exists between Mother and the Children. Rather, the testimony demonstrates that a parent-child bond exists between the kinship foster mother and the Children. Therefore, we discern no abuse of discretion by the orphans' court in concluding that terminating Mother's parental rights serves the developmental, physical, and emotional needs and welfare of the Children pursuant to Section 2511(b). Accordingly, we affirm the orders involuntarily terminating Mother's parental rights.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>9/16/2019</u>